**Walter Wayne BRADBURY, Appellant,**

v.

**Jacklyn A. SCOTT, Appellee.**

**No. 01–88–00845–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 11, 1989.

Rehearing Denied April 12, 1990.

**34**

David A. Carp, Vincent Lee Marable, Deaton, Briggs & McCain, Houston, for appellant.

Alton C. Todd, Britt, Todd & Hagood, Houston, for appellee.

Before COHEN, O'CONNOR and WARREN, JJ.

## OPINION

WARREN, Justice.

Bradbury appeals from a judgment awarding Jacklyn Scott damages on her actions for breach of contract and libel.

Bradbury, a petroleum engineer, owns the majority interest in Bradbury Engineering Group, Inc. ("BEG"), which is located in Friendswood. In the later part of 1981, Bradbury decided to buy a computer, and form a subsidiary corporation to do computer work for his company and contract computer work for other entities. Since Bradbury had insufficient computer experience to run such a company, he sought a person who had the experience, and found Jacklyn Scott.

In January 1982, Bradbury formed Jasco Software, Inc. ("Jasco"), and prepared an agreement between him and Scott governing the financing and operation of the company. Under the agreement, Bradbury or BEG was to provide the investment capital and "carried expenses," including Jasco's overhead expense. Scott was to be an employee of Jasco, and was to own 25% of its stock; Bradbury was to own the remaining 75%.

On February 26, 1982, Jasco opened a bank account with Texas Commerce Bank of Friendswood (TCBF). The signature card furnished to the bank required the signature of both Bradbury and Scott on all checks over $1500. Eight days later, Jasco passed a corporate resolution eliminating the two signature requirement, but the bank signature card was never changed, and the bank was never notified of the resolution.

In each of the first five months of 1984, Scott singularly wrote a Jasco payroll check to herself in excess of $1500 for her salary and retainer.

In June 1984, after many unpleasant disagreements between Scott and Bradbury, Scott resigned. This lawsuit arose because of two letters written by Bradbury after Scott's resignation. On July 12, 1984, Bradbury wrote Texas Commerce Bank of Friendswood the following letter:

July 12, 1984

Mr. Paul Maaz

Texas Commerce Bank–Friendswood

P.O. Box 1268

Friendswood, Texas 77546

RE: Jasco Software, Inc.

    Account No. 042 531

Dear Mr. Maaz:

Effective June 1, 1984 Mrs. Jacklyn A. Scott resigned as President of Jasco Software, Inc. Subsequent investigation and analysis of Jasco's books, bank accounts and other documents indicates a number of areas where Mrs. Scott's actions could be construed as "illegal and not in the best interest of the corporation." One such incident involves Texas Commerce Bank–Friendswood. Since Mrs. Scott has requested that "no contact be made with her", it is now up to you and me to solve this matter, if possible. Let me elaborate.

Jasco's checking account is governed by a signature card defining the maximum permitted amount for a single check, having a single signature, to be $1,500.00. Check Nos. 359, 370, 379 and 392, which are in amounts greater than $1,500.00, were written to Mrs. Scott and signed by Mrs. Scott and subsequently

cashed by your bank. Mrs. Scott's signature, and only her signature, appear on each check. Upon investigation of this matter, I was told by a member of your staff that approval was obtained from "an officer within the bank". *It is my opinion that approval should have been obtained in accordance with the signature card.*

Upon discovering the above in May, 1984, the bulk of Jasco's account was transferred to an unassociated bank in an attempt to protect the corporation from another such occurrence.

It is our opinion that Texas Commerce Bank–Friendswood and Mrs. Jacklyn A. Scott are "joined and several" in this action and are thereby responsible for reimbursement to Jasco in the amount of $6,255.60, which represents the face value of the transactions. Therefore, this transmittal serves as Jasco's formal request to Texas Commerce Bank–Friendswood for reimbursement, without delay, of illegally acquired funds in the amount of $6,255.60.

If you choose to ignore this request, or presume a "no contact" posture as has Mrs. Scott, it is Jasco's intent to pursue alternate routes for justice within the Texas Commerce Bank System. If, by September 1, 1984 at 12:01 PM, this matter is not resolved by Texas Commerce Bank–Friendswood, pursuit through your parent company will commence.

Sincerely yours,
W. Wayne Bradbury
Majority Stockholder

(Emphasis in original.)

As a result of the letter, TCBF refunded Jasco $6255.60, which Bradbury deposited in another Friendswood bank. On September 10th, Bradbury issued a Jasco check for $6000 to Bradbury Engineering Group. Scott repaid the $6255.60 to TCBF.

In 1985, Scott received a 1984 W–2 tax form from Jasco, which included as income the amount that had been refunded to Jasco. Although Bradbury agreed that she was entitled to the sums paid, and that the corporate resolution authorized her to sign the checks, she has never been paid.

On September 10, 1984, Bradbury wrote the following letter to the Friendswood Mustang Booster Club:

September 10, 1984

Mrs. Phyllis Lee
Friendswood Mustang Booster Club
P.O. Box 505
Friendswood, Texas 77546

RE: Jasco Software, Inc., vs
    Mrs. Jacklyn A. Scott and
    Friendswood Mustang Booster Club

Dear Mrs. Lee:

As you may know, Mrs. Jacklyn A. Scott resigned from Jasco Software, Inc. effective June 1, 1984 on June 1, 1984. During her employment, Mrs. Scott made several decisions that could be construed as "illegal and not in the best interest of the corporation". One such incident involves the Friendswood Mustang Booster Club. Let me elaborate.

In March, 1983 it was learned that Mrs. Scott, without authorization, provided the Booster Club with Jasco's "general ledger package", at no charge, for the period beginning January 1, 1982 and ending in March, 1983. Upon my discovery of the situation, Mrs. Scott was then confronted and requested to collect the monies due Jasco. Mrs. Scott chose to pursue a course of omission. It is our opinion that Mrs. Jacklyn A. Scott and the Friendswood Mustang Booster Club are "joined and several" in this action. Since Mrs. Scott has requested that "no contact be made with her", I am requesting that the Booster Club reimburse Jasco for services rendered during the above mentioned period. Therefore, Jasco Software, Inc. formally requests the Friendswood Mustang Booster Club for reimbursement in the total amount of $4,050.00, in accordance with the attached invoice.

Yours very truly,
W. Wayne Bradbury
Majority Stockholder

Scott had been one of the founders of the Booster Club, a charitable organization, benefiting Friendswood public school activities.

The above two letters are the basis of Scott's libel suit. The transactions described in the letter to the bank are the basis of Scott's breach of contract suit.

The jury answered all issues on both causes of action in Scott's favor, awarded her $40,000 for past mental anguish in the libel cause, $50,000 exemplary damages, and attorney's fees. The court, as a matter of law, awarded her $8,705.60 for damages on her breach of contract action.

In 12 points of error, Bradbury claims that: (1) as a matter of law, the letters were not libelous; (2) the evidence was legally and factually insufficient to support the jury's finding that they were libelous; (3) the trial court erred in entering judgment on the libel cause of action, because there was no evidence, nor any jury finding, that Scott's reputation was injured; (4) the evidence was legally and factually insufficient to support the jury's mental anguish award; (5) the evidence was legally and factually insufficient to show malice, therefore punitive damages should not be allowed; (6) the damages were excessive; (7) there was no evidence that Bradbury breached his contract to pay Scott's salary; (8) the trial court erred in entering judgment for attorney's fees; and (9) the evidence was legally and factually insufficient to support a finding that Bradbury was the alter ego of Jasco.

### The Breach of Contract Action

■ In his sole point of error pertinent to the breach of contract action, Bradbury claims that there is no evidence that Bradbury breached any contractual duty to Scott which caused such damage.

Scott's petition alleged that Bradbury and BEG had agreed to pay her salary and retainer for the four months in 1984, and that Bradbury's letter to the bank, which caused her to have to repay the salary for these months, constituted a breach of the contract.

Bradbury's own testimony obliterates his contentions under this point of error. He testified that he had obligated himself and BEG to pay the salary and retainer for the months in question, and that Scott was

entitled to her salary and retainer for those months. On appeal, he argues that the written contract manifests an intent that Bradbury's obligation to pay was limited to an initial period, which did not include the period between January and June 8, 1984. But at trial, on cross-examination, Bradbury agreed that, under the written contract, he and BEG were obligated to pay her salary and expenses up until the month she resigned.

This point of error is overruled.

### The Libel Cause of Action

In answer to questions submitted pertaining to the alleged libelous letters, the jury found that:

(1) Bradbury made libelous statements about Jacklyn Scott (Issue # 2);

(2) the conduct of Bradbury was a proximate cause of the damage sustained by Scott (Issue # 3, predicated on the jury answering "yes" to Issue # 2);

(3) $40,000 would fairly and reasonably compensate Scott for mental anguish in the past that she sustained as a result of the libelous statements (Issue # 7, predicated on the jury's answering "yes" to Issue # 3. In the same Issue # 7, the jury awarded "0" for past and future damages to reputation, and "0" for future mental anguish.);

(4) Bradbury acted recklessly or with malice in connection with the matters made the basis of the suit (Issue # 9);

(5) $50,000 should be awarded to Scott as exemplary damages (Issue # 10); and

(6) Walter Bradbury was the alter ego of Jasco Software, Inc.

In his first point of error, Bradbury contends that, as a matter of law, the letters were not libelous. In support of that contention, he first argues that a significant portion of each letter in question clearly set forth undisputed facts, and could not be actionable. His second contention urges that the letters constituted Bradbury's "pure opinion," which is protected and cannot be actionable.

■ When considering whether a publication is libelous, we must view the publica-

tion from the point of view it would have on the mind of an ordinary reader, and must construe it as a whole, in light of all surrounding circumstances. *Sellards v. Express–News Corp.,* 702 S.W.2d 677, 679 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

Both letters were written shortly after the parties had terminated an unprofitable business venture. Before the termination, the parties had many conferences which usually resulted in arguments about seemingly insolvable problems. Scott and Bradbury had not discussed the checks drawn by Scott with only her signature, but had discussed her furnishing free computer services to the Booster Club. In the discussions between her and Bradbury, Scott explained that she afforded the service to the Booster Club in hopes of accumulating good will and perhaps obtaining new business. She offered to settle the dispute by having the amount claimed by Bradbury deducted from her salary. Bradbury refused, claiming that would be "no solution."

When the letters were written, Scott was still attempting to perform computer services for her own clients. Both letters accused Scott of lacking fidelity and honesty while she was an employee of Jasco.

We disagree with Bradbury's argument that the letters were protected because:

(1) the letters, on their face, cannot be construed to be an opinion;

(2) the privilege afforded "opinions" was waived by Bradbury's failure to request an issue on privilege; and

(3) the finding of malice negates the privilege immunity.

We disagree with Bradbury's proposition that the letters amount to Bradbury's opinion, and as such, are protected. The only phrase in either letter resembling an opinion are those stating, "It is our opinion that Jacklyn A. Scott and the [Friendswood Booster Club]–[Texas Commerce Bank–Friendswood] are 'joined and several' in this action." That phrase pertains only to the culpability or liability of Scott and the Club or the bank, and could not, by any stretch of the imagination, transform the entire letter into Bradbury's opinion.

Although the opinions of a writer are protected and, as such, constitute a privilege, privilege is an affirmative defense in the nature of a confession and avoidance. Except where the plaintiff's petition shows on its face that the alleged libelous publication is protected by a privilege, the defendant has the burden of proving that the publication is privileged. *Denton Publishing Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex.1970).

Because it is the defendant's burden to prove privilege, if he fails to raise the defense in his pleadings and fails to submit or request the defense in his issues, the defense will be deemed waived. *Denton Publishing Co.,* 460 S.W.2d at 885; Tex.R.Civ.P. 279. Bradbury neither pled nor requested an issue on privilege. Even if Bradbury possessed and preserved a privilege, the jury's finding of malice extinguished such a claim. *Buck v. Savage,* 323 S.W.2d 363, 373 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.).

Bradbury's first point of error is overruled.

In his second point of error, Bradbury claims that the evidence is legally and factually insufficient to support the jury's finding that Bradbury made libelous statements against Jacklyn Scott.

Bradbury contends that some of the testimony of the witnesses, concerning their understanding of the meaning of the letters, proves that the letters were factually true and, conversely, that we cannot consider the opinion evidence of Scott in determining if the letters were libelous. We agree with the latter contention. The opinion of the parties has no bearing on whether the complained of words are actually defamatory. *Hajek v. Bill Mowbray Motors, Inc,* 645 S.W.2d 827, 832 (Tex.App. —Corpus Christi 1982), *rev'd on other grounds,* 647 S.W.2d 253 (Tex.1983). However, Bradbury ignores the fact that the letters, together with testimony surrounding their publication, was received by the

jury, and after receiving this evidence, the jury found that the letters were libelous. Further, Mr. Maaz from the bank, and Mrs. Lee of the Booster Club, testified that, when they received the letters, they were under the impression that Scott had done something illegal. There was sufficient evidence to support the jury's finding that the letters were libelous.

Bradbury's second point of error is overruled.

■ Bradbury next claims that Scott was not entitled to judgment on her libel action because there was no evidence of injury to her reputation.

The jury found that Bradbury made libelous statements about Scott, and that he acted recklessly or with malice in connection with the matters made the basis of this suit. No specific question asked the jury to find whether Scott's reputation was damaged. Both questions asking the jury to find the sum of money that would reasonably compensate Scott for injury to her reputation in the past and future were answered "0." Only minimal evidence was elicited showing damage to Scott's reputation.

We are of the opinion that Scott's failure to prove and obtain a finding that her reputation was damaged does not preclude her recovering on the libel action. Both letters were libelous per se because they accused her of conduct that affects a person injuriously in his or her office, profession, or occupation. *Gulf Constr. Co. v. Mott*, 442 S.W.2d 778, 783 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ); *Buck*, 323 S.W.2d at 368. Libel per se means that written or printed words are so obviously hurtful to the person aggrieved by them that they require no proof of their injurious character to make them actionable. *Rawlins v. McKee*, 327 S.W.2d 633, 635 (Tex. Civ.App.—Texarkana 1959, writ ref'd n.r. e.).

To charge an employee with dishonesty in his dealings with his employer is slanderous per se in that it falls within the general classification of "words that affect a person injuriously in his profession or occupation." *Butler v. Central Bank & Trust Co.*, 458 S.W.2d 510, 514 (Tex.Civ.App.—Dallas 1970, writ dism'd).

In both letters, Bradbury accused Scott of a lack of fidelity and honesty in her dealings with her employer. Bradbury wrote the letter to the bank, knowing that the allegations were not true, but with the apparent intention to recover money from the bank on a banking technicality. The tenor of both letters conveyed to the reader that Scott's conduct, while an employee of Jasco, was less than honorable.

Bradbury contends that *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369 (Tex.1984), supports his position that, absent evidence of injury to reputation, there can be no recovery for libel. We disagree. In denying relief to the Wechters on their libel cause of action, the Texas Supreme Court held that, although some of the alleged libelous statements made by Leyendecker's agent were false, they were not libelous per se, and thus, would require evidence of injury to the Wechters' reputation before recovery would be allowed. But the court, when considering other statements concerning alleged criminal acts by Mr. Wechter, explained that, because these statements were libelous per se, the law presumed injury to Mr. Wechters' reputation, and therefore, he could recover his general damages for mental anguish, without proof of damage to his reputation. *Wechter*, 683 S.W.2d at 374.

■ Alternatively, Bradbury contends that the libel damages award cannot stand because the jury questions submitted did not request itemization for damages resulting from each libel, and it is unclear from the answers how much the jury assessed for each alleged libel. In support of his contention, Bradbury cites *Putter v. Anderson*, 601 S.W.2d 73 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). In that case, the plaintiff alleged three libels. The jury found for the plaintiff and, in answer to one damage issue, made a finding of total damages. On appeal, the Dallas court found that two of the alleged libels were statements that were absolutely privileged, but that evidence supported plaintiff's alle-

gation as to the remaining libel action. The court reasoned that, because the libel actions and the damages arising therefrom were lumped into a single issue, the court could not ascertain how much, if any, of the damages should be disallowed. As a result, the court was forced to remand to have the trial court determine the amount of damages due plaintiff on the remaining libel action. We have no such problem here. We have found that both letters were libelous per se, and the question of how much the jury awarded on each libel is academic rather than material. Further, we note that Bradbury did not object to the manner of submission, and has waived other complaints as to the jury charge submitted. Tex.R.Civ.P. 278.

Bradbury's third, fourth, and fifth points of error are overruled.

Bradbury next claims that the evidence is legally and factually insufficient to support the jury's mental anguish award of $40,000.

■■■ In a case of this character, where the amount of the actual damages is not capable of definite ascertainment, and prima facie liability is established, the determination of the amount is necessarily lodged in the discretion of the jury. *Freeman v. Schwenker* 73 S.W.2d 609, 611 (Tex.Civ.App.—Austin 1934, no writ).

■■■ Scott testified to embarrassment, fear, wounded pride, public humiliation, severe irritation, and a stressed homelife. We find that there was sufficient evidence to support the submission of the mental anguish issue and the jury's award on that issue.

Bradbury's sixth point of error is overruled.

■■■ Bradbury's seventh point of error claims that there is no evidence, or insufficient evidence, of malice; therefore, no punitive damages should be allowed. On the contrary, we find much evidence from which the jury could have found malice. Bradbury wrote the letter to the bank, knowing that Scott did nothing wrong by writing the checks, and knowing that if the bank acceded to his demand, it would be at Scott's expense. The letter further stated that the account was moved lest Scott commit additional (illegal) withdrawals. The letter to the Booster Club was completely unnecessary if, in fact, Bradbury's intent was only to recover money that he thought he was owed. He and Scott had discussed her reason for contributing services to the club, and Scott had offered reimbursement to the company. The jury could have concluded that both letters were written purely for spite and with the intent to injure Scott. We find that the evidence is legally and factually sufficient to support the jury's malice finding.

This point of error is overruled.

■■■ Bradbury next alleges that the $40,000 award of damages for mental anguish and the $50,000 award of punitive damages are excessive, and that a remittitur should be ordered. Under this claim, we are required to examine all evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. We need not find passion, prejudice, or other improper motive on the jury's part. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). We find that the evidence is factually sufficient to support both the $40,000 for mental anguish and the $50,000 award of punitive damages, and that no remittitur is required.

Bradbury's eighth point of error is overruled.

In his tenth and eleventh points of error, Bradbury claims that attorney's fees should be denied because no question was asked, or jury findings made, that would support an award of attorney's fees, and that the jury's answers to the damage issue, Issue #8, are against the great weight and preponderance of the evidence.

Issue #8, which was predicated on the jury's finding that Bradbury breached his contract with Scott, reads as follows:

What sum of money do you find to be reasonable and necessary attorney's fees

for the services by the attorney for Plaintiff, Jacklyn A. Scott, as follows:

a. For legal services rendered in the preparation and trial of this cause in this court?

Answer in dollars and cents, if any. Answer: $12,500.00

b. For legal services if this case is appealed to the Court of Appeals?

Answer in dollars and cents, if any. Answer: $5,000.00

c. For legal services for making or responding to an application for writ of error to the Supreme Court of Texas?

Answer in dollars and cents, if any. Answer: $5,000.00

d. For legal services if the application for writ of error is granted by the Supreme Court of Texas?

Answer in dollars and cents, if any. Answer: $5,000.00

Bradbury did not object to the form of the question, but did object on the basis that attorney's fees are not recoverable in personal libel actions, and that the evidence was insufficient to support an award of attorney's fees.

Scott's attorney testified that he spent approximately 100 hours preparing the case for trial; that about 60 to 75% of the time was spent preparing the breach of contract action; that the average charge by a lawyer for this type of work would be between $100 and $125 per hour; and that his attorney fees, including the trial, would be $10,000. He further testified that the charges for handling an appeal would be $5,000; that a charge for handling an application for writ of error would be $1,000 to $1,500; and that, if the Texas Supreme Court granted the application for writ of error, it would cost an additional $2000 to $3000. He also testified, in conclusion, "That would be my opinion concerning what reasonable attorney's fees would be charged for the handling of this type of case."

■ Under that testimony, the evidence is insufficient to support the jury's award of $12,500 for attorney's fees in the trial court. Though Scott's attorney testi-

fied to hours and hourly amounts sufficient to justify a possible award of $9375 (75% of 100 hours or 75 hours, at the highest rate testified to: $125 an hour), he also testified that "My attorney's fees for time spent up to there and including the trial of this case would be $10,000." Thus, an award of 75% of this amount would be $7500, and this is the maximum amount that the jury was authorized to award under the evidence. We have a duty to reduce the amount of attorney's fees awarded if the amount is excessive. *Wuagneux Builders, Inc. v. Candlewood Builders, Inc.*, 651 S.W.2d 919, 922 (Tex.Civ.App.—Fort Worth 1983, no writ). Therefore, we will reform the award of attorney's fees by reducing the amount awarded from $12,500 to $7500. We also find that the jury's answer in response to Issue # 8(c) and Issue # 8(d) pertaining to attorney's fees in the event of an appeal to the Supreme Court of Texas are excessive. We reform the jury's award in Issue # 8(c) from $5000 to $1500, and its award in Issue # 8(d) to $3000, because this is the maximum award that Scott's lawyer's testimony will support.

Bradbury's tenth and eleventh points of error are partially sustained.

■ In his twelfth point of error, Bradbury complains that there is no evidence, or, alternatively, insufficient evidence, to support the jury's finding that Jasco is the alter ego of Bradbury.

Whether or not Bradbury was the alter ego of Jasco has no bearing on the damages awarded by the jury. The jury found that Bradbury, in his individual capacity, breached a contractual obligation to pay Scott's salary, and that Bradbury libeled her; therefore, we find that this issue is immaterial. There is nothing inherently prejudicial in submitting an immaterial issue. *Outlet Co. v. Int'l Sec. Group, Inc.*, 693 S.W.2d 621, 631 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). Our standard of review is to determine if the unnecessary issue amounted to such a denial of rights as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *Outlet Co.*, 693 S.W.2d at 631; Tex.R.App.P. 81(b)(1). We con-

clude that such is not shown in this case, and the error, if any, was harmless.

Bradbury's twelfth point of error is overruled.

The judgment is affirmed as reformed.